Today's cases will be called as previously announced and the times will be as allotted to counsel. The first case today is number 24-1052. United States v. Dario Giambro. At this time, would counsel for the appellant please come to the podium and introduce himself on the record to begin. Good morning, your honors, and may it please the court. My name is Ed McCall. I'm counsel for Mr. Giambro. It's a pleasure to be here this morning. Judge Ruppelman, if I might, I'd like to reserve two minutes for rebuttal. You may. Thank you, your honor. The district court erred in denying the motion to suppress in this case because the court literally, and literally, literally, transmogrified the task established by the United States Supreme Court in Michigan v. Fisher by breaking the Supreme Court's quote into two components and adding a modifier in between, never supported by the Fisher decision or any other precedent of the First Circuit or the Supreme Court. And the modifier was to say rather than that the officers needed an objectively reasonable basis for believing that someone was inside Mr. Giambro's home and needed aid, breaking the quote in half and adding the modifier potentially, which entirely changes the test and makes... Excuse me, we can agree the district court correctly used the objectively reasonable test, correct? The Supreme Court has prescribed an objectively reasonable test and... We can agree on that. All right. We do, your honor. We can agree that the Supreme Court's decision did not overrule its prior case law on the emergency exception to warrant for entry to the house. And we can agree, I think, that if objectively reasonable officers conclude that someone might be dying or in need of medical care, they don't need it to a certainty. They just need to think that there is a risk of it. Are we agreed on that proposition? We agree on much of it, your honor. The district court is mistaken in suggesting that the mere possibility that something might exist is adequate to allow officers to break into a home. Were it adequate... But some possibilities are objectively reasonable to think there is a risk. Your honor, the reason that there was no objectively reasonable risk in this case is because the officers engaged in the break-in and those who testified at the hearing had no basis to believe, they had no information that Mrs. Giambro was either alive or in the house. All of the information they had was to the contrary. Over the course of an hour, your honor, they participated in what in fifth grade, where I went to grade school, we would call the game of radio, where they passed information among themselves. And at one point, Lt. Tilsley, who didn't testify, didn't break in, told one of the officers who did break in, we're investigating a suspected murder, Mr. Giambro has confessed to the murder. That's all mistaken information. I think you made some very good points in your brief about what the facts show in your view. I think the question I have for you is, the police do know that Mrs. Giambro is unaccounted for. And I think the record shows that the last place she was seen was inside the home. So it would be helpful to have your view why, given those two facts, it's objectively unreasonable for them to do what they did. That's an excellent question. I was going to give the example, if I lost my phone, you would ask me, before we started knocking down doors, where's the last place you saw her? And they had no information that the last place Mrs. Giambro had been seen was inside the home. Well, we know he says, the father says, she didn't wake up. So that suggests, we don't know, but she could be in a dead, could be a coma. So that's a piece of evidence that might be suggestive that we should be concerned that he may think she's dead, but she's not. So Antonio, at the hospital, over the course of an hour, the hospital spoke to Mr. Giambro, my client, Terry O. Giambro. He answered all their questions. They were trying to decide whether they should involuntarily commit him. Based on his cogent answers to all their questions, they decided they had no basis for involuntary commission. Antonio Giambro had no doubt that his mother was dead and had no doubt she wasn't in the house. And he never expressed that. How would he know whether, I mean, what basis did he have for that? All he knew was, I went to Florida. She was alive. Now she's dead. And my father, my father said, excuse me, my father says she's dead by telling me she didn't wake up. We know that from the record and from the facts, Antonio knew his mother had been very ill over an extended period of time and that his father was taking care of him. After about two hours, the officers decided to ask Antonio and Dario to go to a different town, a different police station, where they finally did a follow up interview. And Antonio told them all that. I have no doubt my mother's dead and my father had nothing to do with it. So counsel, is your primary argument that the police should have spoken to Antonio before breaking into the house? I think any reasonable person, so to address Judge Lynch's, to put it in the constitutional context, does that. Where's your phone? Where's the last place you had it? Antonio, is there any reason to think maybe your mom, maybe your dad's wrong? Maybe your mom's not deceased. Dario, we're going to break into your house unless you tell us where we can find Mrs. Giambro because we're ill at ease here and eventually someone's going to criticize us. But it turns out she wasn't dead. So that's what you view as the objectively unreasonable action is going into the house without actually questioning. Anybody would have done it, Your Honor. And in this case, we know why Corporal Federico from the Norway PD didn't do it. He didn't do it. He thought about it. He had an answer for why I didn't ask any follow up questions. I didn't talk to Dario. Antonio kept expressing concern for his dad, not for his mom. I didn't ask him, why aren't you concerned for your mom? I didn't ask Dario any questions at all for an hour because I didn't want to step on toes. So it is objectively unreasonable for law enforcement officers to decide, hey, my respect for the feelings about other agencies not wanting to dispose stepped up are more important than the Fourth Amendment. That's wrong. That's unreasonable. May I quote to you from the district court opinion? Because you have left out several factors at the court. Of course, Your Honor. Okay. Law enforcement received information from defendant's own son, Antonio, that his mother, the defendant's wife, was missing and the defendant was acting strangely, so strangely, he took him to the hospital. Antonio also reported that defendant offered only evasive and cryptic answers in response to inquiry about his mother's whereabouts, but also indicated she had died without providing the location of her body. So the son reports that the father is confused. He's mentally acting strangely. He takes him to the hospital. Okay, so let me go back to Judge Rickleman's question. So the police are supposed to not act in response to that, but go to the hospital and interview the son while the mother might possibly be dying? After those communications, Your Honor, and due respect to Judge Singal, I don't believe there's any evidence that Antonio described his mother as missing. He did say she didn't wake up one morning and she was dead, and that my father said he's not in the house. And he did say his father was cryptic or something. That's accurate. That's in the record. All right, so you're saying the factual findings were in error. Well, the missing in particular, Your Honor, but more importantly, an assumption in the court's question is that I'm saying the police shouldn't have gone to the home and done anything and in fact, after those conversations, over an hour goes by. And there are the follow-up questions that I discussed with Judge Rickleman, and they're not asked on purpose because we don't want to step on toes. And that is objectively unreasonable. I'm sorry, we don't want to step on toes? Officer Federico was with Dario and Antonio the entire time, that all this information is going to the Maine DEA and the Maine State Police and the Oxford County Sheriff's Office, and somebody is saying we've got a confession to a murder and we're playing radio with mistaken information. During that entire time, Officer Federico... The district court does not credit the confession of a murder. That's not the basis on which the district court found the emergency aid. Viewing these facts objectively, the court finds that a reasonable officer could have understood defendant's evasiveness and shifting statements about his elderly wife's whereabouts, coupled with her unexplained absence, as an indication she was potentially in danger and in need of immediate aid. And then cites to Justice Kavanaugh's concurring opinion in Coniglia, wherein elderly man is, we'll make it woman, is uncharacteristically absent from Sunday church services, repeatedly fails to answer his phone, and does not respond. Those are the ideal circumstances for use of the emergency aid exception. Here we have an elderly woman. Yes, Your Honor, I understand the court's view and I understand the question, and my point is that during that entire time period, the questions that got asked an hour later, that anybody would have asked right then and there, could your mom be alive, Mr. Giabro, is there any chance that Mrs. Giabro was alive? How would he know that? He didn't, he didn't, how would Antonio know that? He didn't see her eating? He knew of her declining health over a long period of time. He told the officers an hour later, when they finally asked, and also during that time, he was talking at the outset to Trooper Federico about homestead burials. He knew his parents, he knew how private they were, he knew that's what was going to happen. Let me ask you this, so this is sort of how I'm thinking about it, that this emergency aid exception has some parallels to what we talk about when we talk about a terrorist off. It can't be a hunch, but there needs to be some facts that give us reasonable sort of suspicion that there's somebody in peril, and that's a pretty weighty concern that someone might be dying. So you have evasiveness, not, you know, this doesn't look like the father is somebody you can really rely on. You have statements that don't make a lot of sense, you have a son who wasn't around, and so you have a lot of different things that give concern. And on the other side of the balance, you have the possibility that somebody might be dying. And so it's not, you might say, it's not just a hunch, but it's not sure either, and we're looking for reasonableness, and that's what this is. Why is that not the right way to think about it? Well, the test requires a reasonable belief that aid is needed, and under these circumstances... Like reasonable belief, criminal activity is afoot, and there's a lot of things you can think about when you evaluate that. And in the right, I'm not sure I think that Terry Stopp is exactly the correct analogy, but the court's going in the correct direction, and that'll be sorted out by... Counsel, I want to make sure we address the Second Amendment issues, so I'm going to give you a couple more minutes, and I'll do the same for the government. So can I ask a question before you start? Of course. Given the Supreme Court's statement that the statute, I understand it's not a holding, but they have said repeatedly for many years that it's presumptively constitutional. How do you view the burdens that should apply here? Is it your burden, therefore, to prove the unconstitutionality here? How do you think the analysis should be done? I think I have the circuits correct, but I think the Fifth Circuit has it correct that the burden remains on the government where there's a challenge to show that the defendant has a conviction record that's analogous to a conviction record that in the founding era would have resulted in forfeiture of firearms or prohibition of firearms. That's what I contend. The Sixth Circuit has come up with a different test that's more in the direction of the question that you asked, that the defendant has the burden of proof. And I argue for the Fifth Circuit position because it's better... If your client has the burden, do you think you can still win, and why? I do, Your Honor, and here's why. Here, Judge Lynch, the district court plainly made an error in denying us a hearing. And by the way, we preserved this issue by moving to dismiss, by asking for a hearing on the motion to dismiss, by naming a Second Amendment expert as a trial witness, by saying we would call Judge... I'm sorry, not Judge. Dad was a judge. U.S. Attorney McElwee as a witness. And the judge just said, oh, he wasn't prosecuted for a selective reason or because he exercised a Second Amendment right in defending his home back in 2007. He was prosecuted because he was guilty, and these guns are always violent. Ann? No, he said it didn't... Isn't the point that Congress said as to failure to register firearms, the reason for the registration requirement, which does not apply to all firearms, is that these are inherently dangerous weapons? At which point this is a pure issue of law? So that's an unresolved question. But at the 2007... Several circuits have resolved it. Not in the context of whether the U.S. Attorney can selectively prosecute you for a technical... That's a different argument. What does selective prosecution have to do with Second Amendment rights? In this case, Your Honor, and although Judge Singel said he wasn't prosecuted in 2007 because he used a different firearm lawfully to defend his home, that's what he said did happen at the 2007 sentencing. That's what the pre-sentence report, which is at page 188... You're not answering my question. Logically, what is the connection? If the Second Amendment is not offended by 922G1 as applied to a prior crime of using an inherently dangerous weapon, owning it without registering it, what is the logical connection between that and an argument of selective prosecution? If the current United States Attorney then acknowledged... No, no. You are arguing that it was a selective prosecution. I'm asking why that argument helps your Second Amendment claim. They're two different issues. I respectfully submit, Your Honor, that they're not two different issues, that they're related. Admittedly, Your Honor, this is a developing area of the law, so exactly what's in and what's out is going to get decided in the different circuits and ultimately by the Supreme Court over the course of the next months or years. But in the Sixth Circuit, the circumstances of the offense, even if it had been dismissed, would be relevant. In the Fifth Circuit, they wouldn't be. And in all the other circuits, we don't know yet. You're arguing that we need to look at the particular conduct at issue, not just the statute that is the underlying predicate. Is that correct? That's your argument? Including for these reasons. In the underlying record, there's a pre-sentence report that says 5K2.11, competing harms or alternative harms applies here. Congress meant, don't saw off that shotgun. They didn't mean you can't have a collector's gun that you inherited from your grandfather. This offense is outside what Congress intended to do. That's what the pre-sentence report says. It says it that way. So you think we should follow the Sixth Circuit and look at the underlying facts? And the judge agrees with that. Is that correct, counsel? You want us to follow the Sixth Circuit approach just so we understand exactly what your argument is? I respectfully contend that under the Second Amendment and the Equal Protection Clause, the circumstances of a prosecution are relevant, especially if the government has conceded the prosecution was brought before Heller and Bruin. Which makes your Equal Protection point make no sense, because you have to have the purpose to be depriving them of their Second Amendment rights. If we didn't know that they had a Second Amendment right, how could it possibly be an Equal Protection problem? Assistant United States Attorney McElwee said, I brought this prosecution, take his guns away. That's what she said. Right, but if she didn't know, the purpose of her action would be to deprive him of a right, but that's what she wanted to do. She didn't know there was a right. No, the right was established one year later. Right. So I guess the court could say, hey, if they wanted to take away your First Amendment rights in some respect that we didn't, that the Supreme Court didn't fully recognize until 12 months later, your First Amendment rights are gone. I don't think the court would do that with the First Amendment, and I don't think the court should do that with the Second Amendment. The government wanted to take away this man's Second Amendment rights as they're understood now. It did it. It selectively prosecuted him in circumstances where the government said ordinarily we wouldn't do it. This is a different argument from I think what the discussion with Judge Rickleman, which was put that aside. Are you saying that we should analyze whether this strict liability offense of this guy having a gun owned by his grandfather that was in a box and was never used is the kind of thing that suggests he's not dangerous and therefore he can't be prosecuted under 922G? Is that really the argument? That is part of my argument, but I do think the Constitution is offended by an admitted selective prosecution for the purpose of taking away what a year later is recognized to be a core constitutional right for exercising that right. I think that's offensive to the Constitution. Obviously, I'm not going to change your mind in the next 30 seconds. Counsel, we're going to give you time for rebuttal. Thank you very much. Thank you very much. Thank you, Your Honor. Thank you, counsel. At this time, would counsel for the appellate of the United States please introduce himself on the record to begin? Good morning, Your Honors. May it please the Court, Brian Kleinbord on behalf of the government. I guess if it's okay with the Court, I'll briefly address the suppression issue, but I'm also happy to go right into the Second Amendment issue. No, please go ahead. We have some questions about the suppression. Okay. I would just say very briefly I agree with Judge Aframe's characterization that essentially what we're looking at with the emergency aid doctrine is akin to a Terry Stopp inquiry. The standard from Michigan v. Fisher, which this Court has adopted, is that officers need only a reasonable basis, objectively reasonable basis for believing that a person in this case- So here's why it's unreasonable, perhaps. Antonio was in the trailer when he went to see the father. He doesn't go and say, my mother's in danger. He brings the father to the hospital thinking the father might be mentally unwell. That is not what one would expect. If I had two problems, my father might be suffering a mental health crisis, very important. But if I thought my mother was dying, I would not act by just taking my father to the hospital and saying he's unwell. So those are the facts that are known which seem to cut very much against any belief that the mother was in distress in that house where he had been. Well, Your Honor, I think the way I would answer that is just like with a Terry Stopp, we look at the facts that- Counsel, do you have a case saying the emergency aid exception is the same as a Terry Stopp? I'm unaware of any such case. No, no. So why don't we just drop that and why don't we respond as to why an objectively reasonable officer might, as Judge Affram has now framed it, conclude nonetheless that this elderly woman might need assistance? So I think the facts that the officers had that suggested an objectively reasonable basis is that the son knows from what his father is telling him that the mom was in distress, didn't wake up. He didn't take her to, didn't get any emergency assistance for her in light of that, couldn't tell him the location. The father, Mr. Giambro, was acting, his answers were cryptic and evasive about what happened to her. Yes, he takes her, takes him to the hospital. Might he have pursued it a different way? Possibly, but that, you know, we don't look at the alternative- Counsel, what are the objective facts that Antonio's mom is in the house? What objective fact is there in the record to point to that? She's basically been housebound according to the son. I mean, she's in bad health. The son was in the house. It's a small home. It's not a three-story house. He's in the house that morning and says that he didn't see his mom. So it seems to me that the objective facts in the record point to her not being in the house. So what objective fact, not speculation, but what objective fact shows that she was in the house? The father telling him that that's where she was. The father didn't tell him that. He said the opposite. He said she wasn't in the house. Well, she's, I mean, she's either in the house. I think it's reasonable to believe she's either in the house or she hasn't gone far. Well, I'm asking you what makes it reasonable to believe that. Can you actually point me to a fact in the record that says that she, it's objectively reasonable to think that she's in the home? What fact? I don't think, well, first of all, I don't think that the appellant has, we're getting into the realm of clear error of the district court's findings, and I don't think that that is the argument that was made or that I'm hearing. I think that the district court, the district court was reasonable to find on the totality of the facts that were presented that what was provided to the officers was enough for them to believe reasonably that she was in the house and in need of counseling. But I think I'm asking you a different question. Yeah, I'm not giving you a great answer to that. I'm having to submit something to the court that addresses that particular question. So you're not able to point to a fact right now? Not at this time, yeah. Did the son ever represent to the officers that he had done a complete search of the house? No, I don't think that. He was, in fact, concerned about his father, who was there, was alive, and he took him to the hospital because he was in need of help. In the PSR, it is said that the wife had actually filed for divorce and had said that she was a victim of domestic abuse, that her husband had beaten her, and that was one of the grounds for her wanting a divorce. Your brother said that one of the officers involved knew the family very well, had been involved with them before. Did the officers actually know this fact? Is there anything in the record on this point? I don't know that there's anything in the suppression record to indicate their knowledge of domestic violence or anything like that. But, again, that's something I don't know. That was not part of the hearing? I don't think that was part of the suppression hearing. So it's not a fact that Judge Singleton considered? I think that's right. So in addition to disbelief of the father because he seems to be unwell, I mean, Judge Rickleman, we need a 28-J letter. What else is there besides disbelief of the father? And if there is nothing else, tell me why disbelief of the father is a reasonable basis to go in and get into the house to see if the mother's there. Well, it's certainly not just disbelief of the father. So what else is there? They investigate. They go to the scene. They're not getting any answer. They knock loudly on the door. They look in. This is not a situation where they wanted to just barge into the house. They're certainly not. They're doing this divorce from their investigating crime part of their job. They're doing this based on a well-being call. But we need an emergency, right? Because we've said in, the Supreme Court said in Knigley, it's not just that you're not doing a law enforcement crime-fighting activity. We need an emergency. So we disbelieve the father because he seems mentally unwell. And what? What makes us think she is in that house in some form and unwell? Well, again, it's more than we just disbelieve the father. They know from the son that she has had a long illness. She's been housebound. And the statement from the father is she just didn't wake up. Right. He's not providing, he hasn't called the police or other emergency services. These are the facts as found by the district court. She hasn't, he didn't call police or other emergency services. He indicated that she died without providing any details of the location of her body. The officers had received no answer knocking at the door of the trailer or calling out to any occupants and were unable to determine Arlene's whereabouts by looking into the trailer's windows and looking around the residence. The father was acting strangely. He was offering only evasive and cryptic answers in response to inquiries. The son was so concerned about the situation that he took his father to the hospital to have him evaluated for his mental state. Arlene, the mother, was missing. These are the facts that are known to the officers. Counsel, I understand that, and I understand this is a serious situation. Somebody is unaccounted for. So, you know, of course, this is very concerning. But I guess my question to you is if there is a family member available, a son, and the son is available to the police, what rule or principle makes it objectively reasonable to break into someone's house without a warrant before speaking to that family member who is cooperative and available? That's what I'm struggling with here. I think we're looking at it in hindsight and we're suggesting what alternative investigative methods the police officers could have done. I don't think this is a hindsight question. This is a going forward question. We all have elderly neighbors. Those elderly neighbors are often chucked on by their children. The adult child is available to speak to the police, has not contacted the police, has not asked for the police's help, and the police break into that home without a warrant, without speaking to the adult child. So this is a going forward question. What makes that objectively reasonable? I think the facts that make it objectively reasonable are the ones that the district court found. I don't think we want to establish a rule that the police have to. These emergency situations unfold as emergencies do. The officers are doing what they can in a short amount of time to say that they have to consult with an available family member. But I think the challenge is no one has called in an emergency here. That's what I'm struggling with. The adult child that's been in the home that morning has not called in an emergency. I think he's certainly treating it like an emergency. He's trying to get information from his father about his mother's whereabouts and whether she's alive or dead, and he takes his father to the hospital. I don't think the son is not treating it like an emergency. And certainly the officers, we're not looking at whether the son believes it's an emergency, it's whether the officers who are called to respond. The officers know the son has taken the father to the hospital, right, because the hospital contacts the police because they are so concerned about what they have learned from the police. The notion that the son is freely available strikes me as maybe questionable. He's at the hospital with his father. He's trying to explain to the hospital why he's brought the father there. It's not that he's sitting at home and they can go talk to him there. I agree, Your Honor. I think this is a quickly developing situation, and I agree. It's not as if he's seated in front of them and they're discussing the situation and they're failing to ask him questions that could confirm or dispel the situation of the mother inside the house. So I don't think it's the right approach to say that because the record lacks that information, that renders the officers' actions objectively unreasonable. The beginning of your brief says that the law enforcement officers responded to the resident after receiving a call from Antonio that his mother was missing and might be deceased. Is that an accurate statement of what happened? Because that would be different to me. If he called and said my mother's missing, then I would think differently about this as maybe, as opposed to I'm taking my father to the hospital, I'm worried about him, and I don't really say that I have distress about my mother. So which of it is it? I'm right on the first page. I'm in the introduction. It says, in January 2022, are you with me? Yes. The beginning of your brief says that the law enforcement officers responded to Gianboro's resident after receiving a call from Gianboro's son, Antonio, that his mother was missing and might be deceased. Did Antonio call the police and say my mother is missing? I mean, I think so. Where would that be in the record? I mean, that's citing the district court's order. It's also citing D-293. I don't have the suppression transcript, but it's citing the- So that's the PSR. D-293 is the PSR, which doesn't say that. The judge at page 1 and 2 I don't think says that either, so I'm curious where you got the fact that Antonio called the police to report his mother missing, which would make a huge difference. You see that would make a difference, right?  And so if that's true, I want to know it. I know later in the facts it's that he goes to the-Antonio goes to the hospital. I don't remember if he contacted the police on his own or if it was- I think the record is clear that someone at the hospital contacted the police and that Antonio never contacted the police counsel. Yeah, be that as it may, I don't think that that is dispositive of the issue in this case as to whether the police officers acted objectively reasonable. Let me move you to the Second Amendment. I'm going to give you extra time just like I did the opposing counsel. Can you start perhaps with giving us the government's view on what level of generality or specificity we should be doing the Second Amendment analysis here? Because, of course, Mr. DeAndra's counsel says we need to look at his very specific conduct here and see if it's correlative with dangerousness. Other circuits have taken different approaches. They say you don't need to look felony by felony at all, whereas other circuits say you don't look at the conduct, you look at the statute. Does the government have a view on how we should be doing the analysis here? Because it is, as you know, a very evolving area of the law. Yes, I would say that the court should follow the Eighth Circuit approach in Jackson, which was to say that the level of generality that the court should look at is that someone has been convicted of a felony and that there's no need for felony by felony litigation with respect to each defendant presenting an as-applied challenge. And the reason I think that that approach makes sense and is consistent with the Supreme Court, the Bruin test as clarified and refined by Rahimi, is that Rahimi told us that we look at principles that can be derived from our nation's history of gun regulation and that we look at, you know, relevantly similar laws to see if the current law is consistent with that tradition. Counsel, does that mean, so I'm just trying to understand what your position is, does that mean that 922G1 is just, is your position it's always constitutional, full stop, the end, there's no more analysis to do? Our position, yes, our position is that 922G1 is constitutional in all of its applications. Then what are we to make of the, again, I know it's dicta, I understand that, but the Supreme Court has said over and over again it's presumptively constitutional and that phrase presumptively suggests that sometimes it's not. So what do you make of that language, which is really all we have from the Supreme Court about this particular statute? Well, I think if you look at what the Supreme Court said in Heller, I don't necessarily read it as to say that it presumptively means that it's constitutional in some applications but not others. I think what they, the reason they said that is it started with them saying that nothing in our opinion when they were announcing the Second Amendment right, nothing in our opinion should be taken to cast doubt on longstanding prohibitions on the possession of firearms by groups like felons or the mentally ill. Can you point to any sort of founding era or any prior to sort of the modern regulatory state when there were felonies that didn't require a mens rea? So what seems to me to distinguish potentially this from all the felonies I read about in the briefs and we give the death penalty to people is that this is a strict liability offense in the sense you don't need to know that you had to register it. So you are being disarmed because of negligence, and I guess I'm wondering, or could be, and so I'm wondering, do you have anything that suggests that kind of disarming as opposed to for what were common law felonies was part of the thinking? My first response, Judge Aframe, is I disagree that this is a strict liability crime. The Supreme Court in Staples said that even though there is no mens rea set out in the statute, the Supreme Court determined that the... But Freed says this is, the Freed case says that this particular law, you don't need to know that you had to register. You just had to know that you possessed the thing. You need to, well, it says, the Supreme Court has said that the defendant has to have knowledge of the characteristics of the firearm, bringing it within the ambit of the act's registration requirement. So he had to know that this was the type of gun that was potentially dangerous, that was subject to registration. Well, they don't need to know that it's subject to registration. I think that's the split. They need to know the gun has the characteristics that would subject it to registration, but they don't need to know that there's actually a registration requirement, right? Yes, but there's a mens rea requirement. It's not a strict liability offense. There is a mens rea requirement. The second response I would have to that is we don't need a one-for-one twin historical analog. So in Rahimi, where the court upheld 922G8, the court never identified a founding error of law. Right. So this is what's hard, right? Because, yes, that's right. Everything you just said is correct, but we're interested in the why and the how. So the why, I presume, when you tell me in your brief that, like, it's like, you know, we gave death penalty to people, and so you can take their guns away, clearly, and now you're saying, well, but so the why is presumably these people are dangerous, and now we have a crime where you might have just been unaware that you're supposed to file a form with the government and somehow those whys are the same, and I think there's an argument they're not the same. Well, the two principles, it's important, I think, that we identify the two principles that can be distilled about the nation's history of gun regulation. One is that legislatures could always disarm individuals convicted of serious crimes. That's the felonies and capital punishment and estate forfeiture were the penalties for felonies back at the founding. But you agree that this statute covers much more than those serious crimes that are discussed, right? Right, counsel? Yes. I believe you have misread Jackson and overstated what the current law is. Jackson, and let me draw a distinction, there are felonies where all you would look at is the nature of the statute of conviction. That is different than inquiring into the particulars of the crime committed under that felony. Your brother has said you have to look at the particulars of a given crime under that felony and his conclusion from the record is there's nothing dangerous about this guy. He may be eccentric, he may not like authority, but he's not dangerous. That's questionable, but let me step back. Jackson was an as-applied challenge and it says based on his particular felony convictions, Jackson does not say that 922G1 is constitutional as to every single felony conviction. It then says there are two categories. One is where the legislature has long-standing authority and discretion to disarm citizens who are not law-abiding and are unwilling to obey the law. It concludes that that category is met here. Then it says there is an alternative category that some people think applies for those who are deemed more dangerous than a typical law-abiding citizen. There may well be felonies out there that don't fall into either of those categories. That was the import of Judge Aframe's question about status-type crimes that might emerge from a regulatory system. Say the SEC, God knows how many regulatory systems there are. Nothing in Jackson supports your opponent's final argument that you look at the particulars of the particular felony. It does say you look categorically at the felony. I don't know why the government is urging a far broader position than is necessary for you, even if we were to choose to rely on the Jackson situation. Thank you, Your Honor. The part of Jackson that I was referencing was the court saying that there was no need for felony-by-felony litigation. That's correct. That's consistent with the articulation I just gave you. Yes, yes. I would say that the two principles, getting back to the two principles that we know from the nation's history of gun regulation, is one is, as I said, that legislatures can disarm individuals convicted of serious crimes. The second is that legislatures can disarm individuals whose possession of firearms presents a special danger of misuse. And I would argue that Mr. Giambro fits within both of those categories, but certainly fits within the second of those. And that's a group of individuals that... And that's because these are dangerous guns? Is that what you're trying to say? I mean, the registration requires that you have to know that these are dangerous guns. Yes, yes. I would say that because he's convicted of... I would say that his conviction for having an unregistered firearm under the National Firearm Act is because that's a subset of guns and destructive devices that Congress has identified as particularly dangerous and he's not handling them in a responsible way by not registering them? Yes, that's correct, Your Honor. And in fact, he used it, whether it was in self-defense or not. It was still an operational... Yeah, it was certainly not in self-defense, Your Honor. No, no, don't go there. The fact is he used the weapon. It was still operational, even if it was an antique. And again, we don't need to fight... I have one other question for you. The Fifth Circuit says that all of the language in the many Supreme Court cases about a presumption, a mere presumption, that the felon in possession statute is constitutional. If it's a presumption, it can be overcome. But the Fifth Circuit says that's sheer dicta and it's inconsistent with the reasoning of Rahimi. No other circuit has taken that position and in fact, the Eleventh Circuit has directly held to the contrary. You know, the First Circuit rule is that this question may not matter except for how the Fifth Circuit has elevated it. Because in the First Circuit, usually, whether it's a holding or dicta, it's obviously considered dicta and we have always, as the Court said, we follow the dicta from the Supreme Court. But, you know, has the government taken a firm position on whether this is dicta that can be just disregarded? Well, as to 922G1 being presumptively lawful, obviously that particular part of the statute hasn't come before the Court. You mean the Supreme Court? The Supreme Court. However, they've repeated that in every Second Amendment opinion all the way through Rahimi. But the other thing, I think the best evidence of how the Supreme Court might treat 922G1 is in Rahimi. Immediately after the Court found that 922G8 was constitutional, the Court said, we do not suggest that the Second Amendment prohibits the enactment of laws banning the possession of guns by categories of persons thought by a legislature to present a special danger of misuse. I would argue that the Court was at least aware of 922G1 when they said that. And I think that that's very persuasive evidence of how they would treat this. And I would say that that's consistent with the history and tradition of disarming individuals in groups like that. And Mr. Giambro certainly fits within that group of people. Thank you, Counsel. At this time, the Counsel for the Appellant would please reintroduce himself on the record. He has a two minute rebuttal. Thank you, Mr. Giambro. I just want to address a small number of factual assertions that are mistaken and clarify the record in a few respects. First of all, Judge Ruckelman is directly correct. There's no evidence in the record, and in fact, Antonio made no attempt to contact law enforcement, emergency aid assistance, or otherwise concerning his mother or otherwise. He took his father to the emergency room at the hospital two towns away because he was concerned about his father. Second, while he was there, the hospital called the police. Norway police corporal Federico appeared, and the first conversation they had, because part of it's caught on a Federico calling back in the dispatch, is about burials on the homestead. Second, Judge Lynch, with due respect, although Antonio was not at the home, he was continuously in the presence of Corporal Federico or Trooper Philibran, when Trooper Philibran was following them down to the next town an hour later after the break-in. And Corporal Federico was always there. He was always observing Antonio and Dario. He was constantly in conversation with them. Dario did not want to go in and speak to the emergency room. Doctors came out, or a doctor came out and spoke to Dario in Trooper Federico's presence. And then the third point I want to make in how this information moved around to the folks who broke in, is the only person who broke in and spoke to any of Giabro, Giabro, or Federico was Officer Tyner, who was not called to testify. Tyner was told, according to Federico, about the old gun collection. The other officers also said, we didn't know anything about guns. Federico said he told Tyner, Giabro is a gun collector, suspicious of authority, the government chose not to call him, so we have an incomplete game of radio, but continuously the folks knew Antonio Giabro was cooperative in the presence of law enforcement officials who were in contact with the folks who broke in. So your basic point is because Corporal Federico was in the lobby of the emergency department with the son, he should have asked the son more questions and should not have dispatched people to the house to check on the mother? He didn't dispatch people to the house. He actually suggested to dispatch that Tony come to the hospital. He wasn't actually at that time in the waiting room at the hospital. He was outside by the car. Dario's in the car, Antonio's either in the car or around the car, and Federico's right next to them for the entire time period. Can you ask one question before you sit down? Assume hypothetically that we agreed with you on the Fourth Amendment. In your view, do we need to reach the Second Amendment question? I've thought about that. I think a re-prosecution is unlikely, so I think probably as a practical matter the court could reserve a ruling on that. Thank you.